

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LARRY MACK,                    )
                               )
      Petitioner,              )
                               )
    v.                       )    No. 05 C 2999
                               )
DEIRDRE BATTAGLIA,             )    Judge Ruben Castillo
                               )
      Respondent.              )

## MEMORANDUM OPINION AND ORDER

Petitioner Larry Mack —who is currently serving a natural life sentence for first-degree

murder—has petitioned this Court for a writ of habeas corpus pursuant to Section 2254 of the

Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. §

2254. (R. 1-1.) In support of his petition, Mack argues that his sentence violates *Apprendi v.*

*New Jersey*, 530 U.S. 466, 490 (2000), which held that "[o]ther than the fact of a prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

maximum must be submitted to a jury, and proved beyond a reasonable doubt." His petition

challenges the Illinois Appellate Court's decision affirming his natural life sentence on the

ground that the trial court's *Apprendi* violation was harmless. (R. 1, Pet. at 16.) Specifically,

Mack argues that the Appellate Court's application of the harmless error doctrine was contrary to

and involved an unreasonable interpretation of the federal law and arose from an unreasonable

determination of the facts of his case. (*Id.* at 15-20.)

Mack's petition sets forth two additional bases for relief. First, Mack argues that, in the

absence of a jury verdict, an *Apprendi* violation can never be harmless error. (*Id.* at 20.) Second,

Mack argues that his due process rights under the Fourteenth Amendment were violated because

the judge who decided his appeal in state court was the Illinois Attorney General at the time of his conviction and direct appeal. (*Id.* at 20-22.) Because we agree that the Appellate Court's harmless error decision involved an unreasonable determination of the facts of this case and was based on an unreasonable application of federal law, we need not reach these additional arguments.

## BACKGROUND

This case has a long and complicated procedural history which we will describe in detail given its central importance to Mack's current claims. We have gleaned this history from the state court materials Respondent Deirdre Battaglia provided pursuant to Rule 5 of the Rules Governing Section 2254 Cases for the United States District Courts ("Section 2254 Rules") as well as Mack's statement of facts.[1]

### I.     Mack's Conviction and Direct Appeal

In 1981, after he waived his right to a jury trial, Mack was given a bench trial on three counts of murder and two counts of armed robbery in connection with his role in a bank robbery and fatal shooting. (R. 11, Answer, Ex. A, *People v. Mack*, 473 N.E.2d 880, 884 (Ill. 1984).) The evidence at trial showed that Mack entered the West Pullman United Savings Bank in Chicago on November 23, 1979. (*Id.*) John McGinty—a loan officer for the bank—testified that Mack approached Joseph Kolar—the bank's security guard—and pulled a gun from under his

---

[1] Respondent has not objected to any of the facts set forth in Mack's petition. Nor has she submitted any state transcripts to contradict those facts, stating that the transcripts are unnecessary because "respondent believes the petition can be disposed of based upon the filed pleadings." (R. 11, Answer at 7.) As a result, and pursuant to Federal Rule of Civil Procedure 8(d), we will rely on Mack's statement of the facts where necessary to fill in information not provided in the exhibits. *See also* Section 2254 Rule 11.

coat which he then placed inches from Mr. Kolar's collar. (*Id.* at 884-85.) When Mr. Kolar tried

to push the gun away, Mack shot him in the right arm. (*Id.* at 885.) Mack placed the gun against

Mr. Kolar's back, walked or pushed him over to a set of windows, and forced him to lie on his

back on the floor. (*Id.*) Mack then stood over Mr. Kolar, straddled him with his legs, and fired a

fatal shot into Mr. Kolar's chest. (*Id.*) Mack took Mr. Kolar's gun from its holster. (*Id.*) As

Mack stood over Mr. Kolar, his two accomplices—Peterson and Turner—entered the bank and

gathered money while Mack patrolled the area in front of the teller's cages. (*Id.*) Shortly after

exiting the bank, Mack, Peterson, and Turner were apprehended by three police officers and

arrested. (*Id.*)

Upon completion of the bench trial, Mack was convicted of three counts of murder and

two counts of armed robbery. Under the law in effect in Illinois in 1979, the sentencing range for

murder was imprisonment for a term of twenty to forty years. (R. 1, Pet. ¶ 13 (citing Ill. Rev.

Stat. Ch. 38 § 1005-8-1).) Under Section 9-1(b) of the statute—which sets forth a number of

aggravating factors that support an extended term sentence—a person who commits first degree

murder may be sentenced to death if the defendant is at least eighteen years old and:

> 6. the murdered individual was killed in the course of another felony if: (a) the
> murdered individual was actually killed by the defendant and not by another party to
> the crime or simply as a consequence of the crime; and (b) the defendant killed the
> murdered individual intentionally or with the knowledge that the acts which caused
> the death created a strong probability of death or great bodily harm to the murdered
> individual or another; and (c) the other felony was one of the following: armed
> robbery . . . .

(R. 11, Answer, Ex. H, *People v. Mack*, 658 N.E.2d 437, 439 (Ill. 1995) (quoting Ill. Rev. Stat.

1979 Ch. 38 § 9-1(b)(6)) (emphasis omitted).) The statutory sentence for first degree murder

could also be extended to natural life if one of the statutory aggravating factors listed in Section

3

9-1(b) was present, or if "the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty[.]" (R. 1, Pet. ¶ 14 (citing Ill. Rev. Stat. Ch. 38 § 1005-8-1(a)(1)(b)).)

After finding Mack guilty of murder and armed robbery, the trial court held a bifurcated sentencing hearing before a jury to determine whether Mack should receive the death penalty. (R. 11, Answer, Ex. A, *People v. Mack*, 473 N.E.2d at 884.) In the first phase of the hearing the jury found that Mack satisfied a statutory aggravating factor. (*Id.*) In the second phase, the jury heard evidence in mitigation and found no factors sufficient to preclude a death sentence. (*Id.*) As a result, Mack was sentenced to death. (*Id.*) Mack appealed directly to the Illinois Supreme Court, which vacated two of Mack's murder convictions and one of the armed robbery convictions. (*Id.* at 898.) It upheld Mack's conviction and sentence for the armed robbery of McGinty and his conviction and sentence for "intentionally and knowingly shooting and killing Kolar[.]" (*Id.*)

After his death sentence was upheld, Mack petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court granted the petition, vacated the judgment, and remanded the case to the Supreme Court of Illinois for consideration in light of *Griffith v. Kentucky*, 479 U.S. 314 (1987). (R. 11, Answer, Ex. C, *Mack v. Illinois*, 479 U.S. 1074 (1987).) After a hearing was held in the Cook County Circuit Court on Mack's claim of purposeful discrimination in jury selection, the Illinois Supreme Court affirmed the Circuit Court's finding that the State had provided sufficiently race-neutral reasons for its peremptory challenges. (R. 11, Answer, Ex. E, *People v. Mack*, 538 N.E.2d 1107, 1113 (Ill. 1989).) It also set a date for Mack's execution. (*Id.* at 1117.) Mack again petitioned the United States Supreme Court for a

4

writ of certiorari, but this time his petition was denied. (R. 11, Answer, Ex. F, *Mack v. Illinois*, 493 U.S. 1093 (1990).) Mack then sought and was denied rehearing before the Untied States Supreme Court. (R. 11, Answer, Ex. G, *Mack v. Illinois*, 494 U.S. 1092 (1990).)

## II.    The Post-Conviction Proceedings

On July 31, 1990, Mack filed a petition for post-conviction relief in the Cook County Circuit Court claiming that his death sentence was improper because the jury's verdict did not specify that he acted with the requisite mental state to qualify for the death penalty. (*See* R. 11, Answer, Ex. H, *People v. Mack*, 658 N.E.2d at 440.) The aggravating factor under which Mack was sentenced specifies that the defendant must have killed "intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm." Ill. Rev. Stat. 1979 ch. 38, par. 9-1(b)(6). The verdict form supplied to and returned by the jury in connection with this aggravating factor omitted any specification that the defendant acted with the requisite mental state of intent or knowledge. (R. 11, Answer, Ex. H, *People v. Mack*, 658 N.E.2d at 440.) Instead, it simply stated: "[w]e the jury, unanimously find beyond a reasonable doubt that the following aggravating factor exists in relation to this Murder: Larry Mack killed Joseph Kolar in the course of an Armed Robbery." (*Id.*)

The Cook County Circuit Court agreed that, in the absence of a proper jury determination that the requisite mental state existed, Mack's sentence was unconstitutional. (*Id.*) It vacated Mack's sentence and ordered a new sentencing hearing. (*Id.*) The State appealed directly to the Illinois Supreme Court arguing that Mack had waived this claim by failing to raise it on direct appeal. (*Id.*) The Illinois Supreme Court rejected this argument, finding that Mack had not waived his claim because his counsel was ineffective for failing to raise it on direct appeal. (*Id.*

5

at 441.) It also found that the death sentence verdict could not withstand constitutional scrutiny because it did "not state that [Mack] was found eligible for the death penalty," and it "attempted to set forth a statutory aggravating factor, but failed to do so completely and omitted an essential element." (*Id.* at 444.) Thus, the Illinois Supreme Court affirmed the circuit court's decision vacating Mack's death sentence and ordering a new sentencing hearing. (*Id.*)

The State sought and was denied rehearing before the Illinois Supreme Court. (R. 11, Answer, Ex. I, Ill. Sup. Ct. Order.) After Mack unsuccessfully attempted to bar an additional hearing, the case proceeded to a second sentencing hearing. (R. 11, Answer, Ex. J, *People v. Mack*, 695 N.E.2d 869, 871, 873 (Ill. 1998); *Id.*, Ex. K, *Mack v. Illinois*, 525 U.S. 1007 (1998).)

## III. The Second Sentencing Hearing

### A. The State's Evidence

The State sought the death penalty at the second sentencing hearing, again asserting that Mack killed Mr. Kolar during an armed robbery and that he did so intentionally or with knowledge that his actions caused a strong probability of great bodily harm or death. (R. 1, Pet. ¶ 11.) The State brought evidence that Mack had shot Mr. Kolar two times: first in the arm and then intentionally in the heart. (*Id.* ¶ 44.) During the State's presentation of the case, the 1981 trial testimony of Gloria Starks—who was deceased at the time of the second sentencing hearing—was read into the record. (*Id.* ¶ 51.) Ms. Starks testified that she was working at the bank when she heard a popping sound and saw Mack with Mr. Kolar. (*Id.*) She testified that Mack and Mr. Kolar moved toward the window, Mr. Kolar got on the floor, and Mack was standing over him when she heard another popping sound. (*Id.*) Ms. Starks identified Mack as the person with the gun. (*Id.*)

John McGinty testified that at 11:30 a.m. on November 23,1979, he witnessed Mack walk into the bank, stop in front of Mr. Kolar, and point a .9 mm gun at Mr. Kolar's chest. (*Id.* ¶ 52.) McGinty testified that Mr. Kolar put up his arm as if to get the gun away from him. (*Id.*) On direct examination, McGinty testified that Mack moved the gun, cocked it, and fired it into Mr. Kolar's right arm, then grabbed Mr. Kolar by the back of the collar, walked him toward the windows, and pushed him to the ground. (*Id.*) McGinty also testified that Mack then leaned over Mr. Kolar, straddled him, and shot him from a distance of a foot to a foot and a half. (*Id.*) On cross examination, McGinty acknowledged that the first shot happened when Mr. Kolar put his left hand on Mack's gun and pushed and pulled it. (*Id.* ¶ 53.) He stated that the first shot into Mr. Kolar's arm was straight on, from front to rear. (*Id.*) McGinty acknowledged on cross that he did not mention Mack cocking the gun in his 1981 trial testimony although he had been asked to describe exactly what happened. (*Id.*) He also acknowledged that he did not see the second bullet hit Mr. Kolar because Mr. Kolar's body was partially obscured. (*Id.*)

Chicago police officer Richard Stake testified on behalf of the State that as he was driving past United Savings and Loan on the day of the robbery he saw three men run out of the bank with plastic bags. (*Id.* ¶ 45.) They got into a nearby car. (*Id.*) In that car Stake discovered the robbery proceeds and two guns: Mr. Kolar's weapon and a .9 mm semi-automatic Radom pistol with an expended shell casing jammed into the slide area. (*Id.*) Chicago police lieutenant Peter Dignan testified that he recovered a .9 mm shell casing next to a window in the bank and observed a tear in the carpeting close to where Mr. Kolar was lying, from which 13 bullet fragments were recovered. (*Id.* ¶ 46.)

The State's firearms expert, Christopher Kalkowski, testified that a bullet found on a typewriter table in the bank as well as two discharged cartridges—one found by Stake jammed in the slide of the .9 mm pistol— were fired by the .9 mm Radom gun Stake found in the car. (*Id.* ¶ 49.) Kalkowski testified that the weapon could hold eight bullets in the clip and an additional bullet in the magazine. (*Id.*) If nine bullets were loaded into the gun it would be cocked automatically and the notch safety would be deactivated. (*Id.*) The only safety left on the gun at that point would be the grip safety, which would automatically deactivate when someone gripped the gun. (*Id.*) Because a cartridge would automatically enter the magazine when a shot was fired—if the first cartridge ejected properly—there would be no need to re-cock the gun. (*Id.*) On cross examination, Kalkowski acknowledged that a phenomenon known as "limp wristing" could cause a cartridge to jam in the gun's slide, as was the case in the .9 mm gun that Stake recovered. (*Id.* ¶ 50.) He testified that the gun's ejection mechanism depends on a person holding the gun tightly and if a person holds the gun loosely, the cartridge may not eject properly. (*Id.*)

The prosecution also presented evidence regarding the nature of Mr. Kolar's wounds. Lieutenant Dignan testified that he went to Roseland Hospital where he observed Mr. Kolar's body. (*Id.* ¶ 47.) He observed a powder burn on the upper left hand side of the shirt, a bullet would five inches above the left nipple and five inches to the left of the midline and a "through and through" gunshot wound on the right arm with what he testified was residual powder burn on the biceps. (*Id.*) Cook County Medical Examiner Dr. Edmund Donoghue testified that the fatal gunshot wound entered Mr. Kolar's left upper chest and passed from side to side across the chest. (*Id.* ¶ 54.) He also testified that Mr. Kolar suffered a gunshot wound to the right arm where the

8

bullet entered on the inside of the arm and exited on the front. (*Id.*) On cross, Dr. Donoghue

testified that the "chest wound was consistent with the shooter standing to the side of the victim .

. . but was inconsistent with him being shot as he lay flat on his back . . . and that it was possible

that both wounds were caused by the same bullet." (*Id.* ¶ 55.)

## B.    The Defense's Evidence

At the second sentencing hearing, the defense brought evidence that Mack accidentally

shot Mr. Kolar once while they struggled over his gun and that the second shot did not hit anyone

but impacted directly into the floor. (*Id.* ¶ 44.) In support of this theory, Professor of

Criminalistics Peter DeForest testified that he examined the bullet fragments recovered from the

bank in 1979 and 2000 and determined that they constituted one bullet.[2] (*Id.* ¶ 57.) Professor

DeForest testified that this bullet had "impacted the floor directly, did not strike anyone, and did

not go through anybody's chest." (*Id.*) He testified that the other bullet—which had been

recovered essentially intact—had inflicted the fatal wound. (*Id.*)

The defense also introduced the testimony of a forensic pathologist, Dr. Robert Kirschner,

who testified that the gunshot wound to Mr. Kolar's arm was—to a reasonable degree of medical

and scientific certainty—caused by the same bullet that passed through his chest. (*Id.* ¶ 59.) Dr.

Kirschner testified that the photographs of Mr. Kolar's shirt showing powder burns around the

chest wound indicated that the shot had been fired from between 4-8 or 12 inches away. (*Id.*) He

further testified that Mr. Kolar's arm wound was "inconsistent with a shot straight on from front

_____

[2] Allison Forker—a paralegal with defense counsel's law office—testified that in August of 2000 she went to the building that formerly housed the United Savings and Loan bank and recovered a swatch of carpet containing metal fragments from the vicinity of where the bullet impact occurred in 1979. She sent the carpet and metal fragments to Professor DeForest. (*Id.* ¶ 56.)

to back . . . and the chest wound was inconsistent with someone being shot from above while lying on his back." (*Id.*)

Mack testified at the sentencing hearing on his own behalf. He testified that his intention was to go into the bank, "freeze the officer, and we'll get the money." (*Id.* ¶ 58.) He testified that neither he nor Peterson nor Turner intended to hurt anyone and that he did not think that anyone would be hurt or killed in the course of the robbery. (*Id.*) Mack testified that he entered the bank, pulled out the gun, and held it to Mr. Kolar's chest, expecting him to freeze. (*Id.*) Mr. Kolar, however, reached up and grabbed the barrel of the gun. (*Id.*) Mack testified that "I tried to pull back as he was pulling and the gun fired . . . . [It] was a [*sic*] accident." (*Id.*) He also testified that he did not pull the trigger intentionally: "I did not intend to kill Mr. Kolar. I never wanted to kill Mr. Kolar. It was a [*sic*] accident." (*Id.*) Mack also testified that after the first shot he reached down to take Mr. Kolar's revolver and that his gun unintentionally discharged into the floor as he did so. (*Id.*) He stated that the second bullet did not hit Mr. Kolar. (*Id.*) He testified that Peterson and Turner then entered the bank and took money, and the three exited shortly thereafter. (*Id.*)

## C.    The Sentencing Jury's Verdict and Subsequent Sentence

On October 11, 2001, the jury returned a unanimous verdict declining to recommend the death penalty. Specifically, the jury's verdict stated:

> [w]e, the jury, cannot unanimously find beyond a reasonable doubt that the defendant Larry Mack is eligible for a death sentence under the law. We cannot unanimously find beyond a reasonable doubt that the defendant was 18 years old or older at the time of the murder for which he was convicted in this case or we cannot find unanimously beyond a reasonable doubt that the statutory aggravating factor exists.

(R. 21, Pet.'s Supp. Ex. at 2.) The trial court dismissed the jury and ordered a pre-sentence

10

investigation. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 4-5.) After hearing arguments including Mack's objections to an extended-term sentence under the principles of *Apprendi*, the trial court found that defendant acted with the knowledge that his actions created a strong probability of death or great bodily harm and sentenced Mack to a term of natural life imprisonment. (*Id.* at 5.) The trial court concluded that *Apprendi* did not apply to Mack's sentence because his convictions had become final many years earlier. (*Id.*)

## IV. Mack's Appeal of the Natural Life Sentence

Mack appealed his natural life sentence to the Illinois Appellate Court arguing that the sentence violated *Apprendi*. (R. 1, Pet. ¶ 22; R. 11, Answer ¶ 12.) He also moved for release on bond pending the resolution of his appeal. (R. 1, Pet. ¶ 22.) A panel of the Illinois Appellate Court granted the motion and released Mack on a personal recognizance bond while the appeal was pending. (*Id.* ¶ 23.) On October 17, 2003, Justice Hartigan authored an order affirming Mack's extended term natural life sentence and finding that *Apprendi* did not apply on grounds of non-retroactivity. (*Id.* ¶ 25.)

Upon learning that Justice Hartigan had decided the appeal, Mack moved to recuse him because Justice Hartigan was the Attorney General for the State of Illinois during Mack's prosecution and had been attorney of record for the State in his case. (*Id.* ¶ 26.) Justice Hartigan denied the motion. (*Id.* ¶ 27.) Mack then filed a petition for rehearing on the ground that retroactivity principles did not apply to his case because his sentencing hearing occurred after *Apprendi* was decided. (*Id.* ¶ 28.) During the pendency of his petition for rehearing, the appellate court vacated Mack's bond and he voluntarily surrendered himself to the Illinois Department of Corrections. (*Id.* ¶ 29.)

11

**V.     The Illinois Appellate Court's Modified Order on Rehearing**

On May 7, 2004, the Illinois Appellate Court entered a modified order—again, authored by Justice Hartigan—affirming Mack's natural life sentence on different grounds. (*Id.* ¶ 31; R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 10.) The court held that *Apprendi*, "while not applicable retroactively to sentences that became final many years earlier . . . does apply to all sentences imposed after its decision." (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 6.) The court recognized that the jury at Mack's second sentencing hearing "could not unanimously find beyond a reasonable doubt that an aggravating factor existed making defendant eligible for the death penalty." (*Id.* at 7.) The court held that "the trial court violated *Apprendi* when it sentenced [Mack] to an enhanced term of natural life imprisonment based on [its] factual finding that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."[3] (*Id.* at 8-9.)

Although the Appellate Court found that the trial court violated *Apprendi* in sentencing Mack to an extended term of natural life based on facts not found by the jury, it found that the error was harmless. (*Id.* at 10.) Specifically, the court stated: "we find that a jury would undoubtedly find [Mack]'s behavior to be exceptionally brutal and heinous, indicative of wanton cruelty." (*Id.* at 9.) In support of this finding, the Appellate Court only cited the evidence

---

[3]The Illinois Appellate Court earlier stated that the trial court imposed a natural life sentence based on its finding that Mack "acted with the knowledge that his actions created a strong probability of death or great bodily harm[.]" (*Id.* at 5.) Yet the Appellate Court found that the trial court violated *Apprendi* for sentencing Mack to a life term based on its finding that "the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (*Id.* at 8-9.) Because we have not been provided the trial court transcripts, we cannot determine which basis the trial court used to support the natural life conviction. It is clear, however, that in either case the trial court's sentence was unsupported by the jury's factual finding at the second sentencing hearing.

indicating that Mack had fatally shot Mr. Kolar in the chest as he stood over him. (*Id.*) The Appellate Court then stated that Mack's "behavior characterizes acting in a brutal and heinous manner indicative of wanton cruelty" and stated that it had no doubt that a jury presented with those facts would have found that Mack committed the crime in a brutal and heinous manner indicative of wanton cruelty. (*Id.* at 10.) As a result, the court held that there was no need to re-sentence Mack. (*Id.*)

Mack filed a petition for leave to appeal to the Illinois Supreme Court which was denied on October 6, 2004. (R. 1, Pet. ¶¶ 32-33.) Mack then petitioned the United States Supreme Court for a writ of certiorari, which was denied on April 18, 2005. (*Id.* ¶¶ 34-35.) Mack filed the current petition for a writ of habeas corpus in this Court on May 19, 2005.

## LEGAL STANDARDS

An application for habeas review in federal court can only be granted if it meets the requirements of 28 U.S.C. § 2254(d), which provides:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See also Woodford v. Visciotti*, 537 U.S. 19, 21 (2002) (per curiam). Under this deferential standard, we must "attend closely" to the considered decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*,

529 U.S. 362, 383 (2000). A state court decision is "contrary to" federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's holding. *Anderson v. Cowen*, 227 F.3d 893, 896 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 405-06). A habeas applicant attempting to demonstrate that a state court judgment involves an unreasonable application of federal law must show that a state court incorrectly applied a federal law and that the state court's application was objectively unreasonable. *Woodford*, 537 U.S. at 27.

A habeas applicant's burden is particularly high to show that a state court's determination of facts was unreasonable. The habeas statute makes clear that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The habeas applicant must rebut this presumption of correctness by clear and convincing evidence. *Id.* This deferential standard applies to the findings of state appellate courts as well as trial courts. *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000). Under this standard, the state court's finding is presumed to be correct if it is supported by the record, but if it "rests on thin air, the petitioner will have little difficulty satisfying the standards for relief under § 2254." *Id.* at 592-93.

## ANALYSIS

Mack's petition for relief under the federal habeas statute challenges the Illinois Appellate Court's decision affirming his natural life sentence. There is no question that the trial court's imposition of this sentence violated *Apprendi*; as the Appellate Court acknowledged, the trial

court imposed the extended term sentence based on facts not found by a jury. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 8-9.) The Appellate Court nonetheless affirmed this decision because it found that the *Apprendi* violation was harmless. In his petition for federal habeas relief, Mack argues that this finding is contrary to and involves an unreasonable application of federal law and is based on an unreasonable determination of the facts in light of the evidence presented at the second sentencing hearing. (R. 1, Pet. at 15-20.) For the reasons set forth below, we agree.

## I.    Unreasonable Determination of Facts

We find that Mack has shown by clear and convincing evidence—as is his burden under 18 U.S.C. § 2254(e)(1)—that the Appellate Court engaged in an unreasonable application of the facts presented at the state court proceeding when it found that there was no reason to re-sentence Mack because any jury would have found that he acted in a brutal and heinous manner indicative of wanton cruelty. The Appellate Court made this finding despite Mack's presentation of evidence at the second sentencing hearing which contradicted the State's theory that Mack killed Mr. Kolar intentionally. The sentencing jury considered this evidence and was unable to find beyond a reasonable doubt that Mack's crime satisfied an aggravating factor which requires a finding that Mack acted with intent or knowledge. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 4.) The Appellate Court nonetheless found that it was beyond any reasonable doubt that a jury would have found that Mack's crime was committed in a brutal and heinous manner, indicative of wanton cruelty.[4] (*Id.* at 10.)

---

[4]The aggravating factor on which the Appellate Court relied allows for an extended term natural life sentence where a murder "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. Ch. 38 § 1005-8-1(a)(1)(b).

15

The Appellate Court correctly noted that resentencing may not be necessary where an *Apprendi* violation occurred but "overwhelming evidence" shows that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (*Id.* (citing *People v. Thurow*, 786 N.E.2d 1019 (Ill. 2003); *People v. Crespo*, 788 N.E.2d 1117 (Ill. 2003), *cert. denied*, 540 U.S. 889 (2003); *People v. Kaczmarek*, 798 N.E.2d 713 (Ill. 2003), *cert. denied*, 540 U.S. 1199 (2004)).) The harmless error test that applies on direct review is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[5] *Chapman v. California*, 386 U.S. 18, 24 (1967). In order for the harmless error standard to apply to an *Apprendi* violation, the evidence supporting the enhanced sentence must be overwhelming and essentially uncontradicted. *See, e.g., Thurow*, 786 N.E.2d at 1028-30 (citing *Chapman* and finding harmless error where the erroneously omitted element was undisputed). In *United States v. Cotton*, 535 U.S. 625 (2002), for example, the United States Supreme Court applied the similar plain error standard in a case where the defendants received an enhanced sentence based on a drug quantity that was neither alleged in the indictment nor presented to the jury, in violation of *Apprendi*.[6] In applying the plain error standard, the Supreme Court noted that the evidence regarding the drug quantity was "overwhelming and essentially uncontroverted." *Id.* at 633 (internal quotations omitted). As a result, the Court found no plain error had occurred because the grand jury surely would have found that the crime involved the

---

[5]Although the Appellate Court never expressly stated that it was applying harmless error, it is clear from its analysis and cases cited therein that this was the standard it applied. (*Id.*) Both parties concede that this is the case. (R. 1, Pet. at 16; R. 11, Answer at 11.)

[6]The plain error—rather than the harmless error—standard applied because the respondents failed to raise the *Aprrendi* issue before the district court. *Id.* at 629.

16

amount of cocaine that justified the extended sentence. *Id.* at 634.

The Illinois Supreme Court has applied the harmless error standard to *Apprendi* violations where there is overwhelming evidence of exceptionally brutal or heinous behavior indicative of wanton cruelty.[7] It has also framed specific parameters for behavior that qualifies as brutal, heinous, or wantonly cruel within the meaning of the aggravating factor. The Illinois Supreme Court has recognized that "[a]ll murders are brutal and heinous to a certain degree," but the statutory aggravating factor allowing for extended-term sentences "was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence." *People v. Andrews*, 548 N.E.2d 1025, 1032 (Ill. 1989) (quoting *People v. Evans*, 429 N.E.2d 520 (Ill. 1981)). Courts in Illinois define "heinous" behavior as that which is "hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal." *Id.* at 1031 (internal quotations omitted). The word "brutal" is defined as "grossly ruthless, devoid of mercy or compassion: cruel and cold-blooded." *Id.* (internal quotations omitted). As the Appellate Court recognized in Mack's case, "'wanton cruelty' requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense." (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 9 (quoting *Kaczmarek*, 798 N.E.2d at 723).)

The Illinois Supreme Court has applied the harmless or plain error standards to *Apprendi* errors based on a finding of heinous or brutal behavior indicative of wanton cruelty in cases where the evidence presented at trial is virtually uncontroverted. In *Crespo*, for example, there

---

[7]*See also Blakely v. Washington*, 124 S. Ct. 2531, 2537 (2004) (finding that the trial court violated the Sixth Amendment where it enhanced a defendant's sentence beyond the maximum statutory range based on its finding that he acted with "deliberate cruelty" when the defendant contested the facts supporting that finding and the facts had not been found by a jury).

17

was undisputed forensic evidence establishing that the defendant attacked his victim with a kitchen knife, stabbed her repeatedly in the head, neck, and body using such force that the knife was bent to a 90-degree angle, and that he ripped a large clump of hair out of the victim's head with the scalp still attached. 788 N.E.2d at 1124. On the basis of this uncontested evidence, the court held that any jury would have found that the crime was brutal, heinous, and indicative of wanton cruelty. *Id.* at 1124-25. In *Kaczmarek*, the medical evidence revealed that in the course of murdering an elderly woman, the defendant inflicted multiple abrasions, stab wounds, and blunt trauma injuries and manually strangled her during an "intense and prolonged struggle[.]" 798 N.E.2d at 722-23. Based on this evidence, the court found that any jury would have found the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. *Id.* at 723.

Mack has shown by clear and convincing evidence that the State's evidence at the second sentencing hearing showing that he intentionally executed Mr. Kolar was neither uncontested nor overwhelming. At that hearing, Mack brought evidence to support his version of the crime: that he accidentally shot Mr. Kolar in the course of an armed robbery when the two struggled over his gun. This evidence included expert testimony that the second bullet—the shot that the State argued Mack fired intentionally into Mr. Kolar's chest—did not strike anyone. (R. 1, Pet. ¶ 57.) It also included a forensic pathologist's testimony that the gunshot wound to Mr. Kolar's arm was caused by the same bullet that passed through his chest. (*Id.* ¶ 59.) The same expert testified that Mr. Kolar's chest wound was inconsistent with his being shot from above while he lay on his back, which was the State's version of events. (*Id.*) Moreover, the State's eye witness to the shooting stated on cross examination that he did not see the second bullet hit Mr. Kolar's

body because Mr. Kolar was partially obscured from his vision. (*Id.* ¶ 53.) The Cook County Medical Examiner, who testified for the State, stated on cross examination that Mr. Kolar's chest wound was inconsistent with him being shot as he lay flat on his back. (*Id.* ¶ 55.) He also testified that it was possible that both wounds were caused by the same bullet. (*Id.*) All of this evidence supported Mack's position that Mr. Kolar was killed by a shot Mack accidentally fired during a struggle over the gun and that the second bullet discharged into the floor without striking Mr. Kolar.

Our conclusion that the Illinois Appellate Court made an unreasonable determination of the facts is mandated by the second sentencing jury's verdict. After reviewing the evidence described above, the sentencing jury returned a verdict stating that it could not "unanimously find beyond a reasonable doubt that the defendant was 18 years old or older at the time of the murder for which he was convicted in this case or we cannot find unanimously beyond a reasonable doubt that the statutory aggravating factor exists." (R. 21, Pet.'s Supp. at 2.) Neither side has alerted this Court to any dispute over Mack's age at the time of the offense, so it is clear that the jury could not find the statutory aggravating factor, which requires a finding that: (1) Mack killed Mr. Kolar; (2) Mack did so with knowledge or intent that his actions would cause death or great bodily harm; and (3) the murder occurred in the course of an armed robbery. (R. 11, Answer, Ex. H, *People v. Mack*, 658 N.E.2d at 439 (quoting Ill. Rev. Stat. 1979 Ch. 38 § 9-1(b)(6)).) Mack did not deny that he shot and killed Mr. Kolar and he had already been convicted of armed robbery in connection with the events at the bank. Thus, it is apparent that the jury was unable to unanimously find that Mack acted with the requisite intent or knowledge that his actions would result in death or great bodily harm.

In light of this record, it is unclear how the Illinois Appellate Court could conclude beyond a reasonable doubt that any jury would find that Mack acted "in a brutal and heinous manner, indicative of wanton cruelty." (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 10.) As noted above, a finding that Mack acted with wanton cruelty requires proof that he consciously sought to inflict pain and suffering on Mr. Kolar. The jury's inability to find—based on the evidence at the sentencing hearing—that Mack acted with intent or knowledge is simply irreconcilable with the Appellate Court's conclusion that any jury would find beyond a reasonable doubt that Mack acted with wanton cruelty. It is also inconsistent with the standards for a "brutal" crime, which requires behavior that is grossly ruthless and devoid of mercy or compassion. *Andrews*, 548 N.E.2d at 1031. Given the evidence that Mack shot Mr. Kolar only once and that this shot occurred when the two struggled over his gun, the Appellate Court engaged in an unreasonable determination of the facts of the state court proceedings in concluding that the evidence was "overwhelming" that Mack acted in a brutal or heinous fashion that was indicative of wanton cruelty.[8]

Although the factual determinations of the Illinois Appellate Court are entitled to substantial deference under the habeas statute, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also*

---

[8]Even if the jury had found that Mack intentionally or knowingly shot Mack in the course of an armed robbery, such a finding would not justify the Appellate Court's conclusion that any jury would find that the crime was brutal, heinous, and indicative of wanton cruelty. The statutory aggravating factor codified in Section 5-8-2 "was not intended to convert every offense into an extraordinary offense subject to an extended-term sentence." *Andrews*, 548 N.E.2d at 1032 (quoting *Evans*, 429 N.E.2d 520). Acting with intent or knowledge does not automatically elevate a murder offense under this statutory factor; the requirements for a finding of brutal, heinous, and wantonly cruel acts are significantly higher. *Id.*

*Mendiola*, 224 F.3d at 592-93. It is not our role to make credibility determinations or to re-weigh the evidence that the Illinois Appellate Court considered. We have not done so here. Instead, we have simply noted the existence of the evidence that Mack submitted at the second sentencing to contest the State's theory that he intentionally executed Mr. Kolar. In light of this evidence—regardless of its credibility or the weight it is due—as well as the jury verdict actually returned in that proceeding, we find that the Illinois Appellate Court's conclusion that any jury would have found that Mr. Kolar qualified for an extended term natural life sentence is unsupported by the record and based on an objectively unreasonable determination of the facts of the state court proceeding. *See Miller-El*, 537 U.S. at 340. Mack has thus met his burden of showing by clear and convincing evidence that he is eligible for relief pursuant to 28 U.S.C. § 2254(d)(2).

## II.    Contrary to or Unreasonable Application of Clearly Established Federal Law

To resolve Mack's claims under Section 2254(d)(1), we must ask whether the Illinois Appellate Court's finding that the trial court's *Apprendi* violation was harmless was contrary to or involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). Although the Appellate Court did not cite the federal rule for harmless error, the Illinois Supreme Court cases it relied on recognize that whether an *Apprendi* violation is harmless is determined by the federal harmless or plain error standards. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 9 (citing *Thurow*, 786 N.E.2d at 1028; *Crespo*, 788 N.E.2d at 1124.) The federal harmless error standard that applies on direct review is the *Chapman* standard: "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. Under this

standard, a conviction can stand in the face of a constitutional error only where it is apparent "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," or in this case, the sentence issued. *Id.* This is the same standard that the Appellate Court applied in its review of Mack's extended-term sentence. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 9-10.)

The Supreme Court has established that the harmless error question does not rest on a hypothetical analysis of what a fact-finder might have found; rather, it scrutinizes the basis on which a fact-finder actually rested its decision. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Thus, a court conducting a harmless error analysis must ask "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (emphasis in original). Harmless error does not apply if "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *United States v. Neder*, 527 U.S. 1, 19 (1999).

The Supreme Court has also clearly established that a reviewing court should conduct a thorough examination of the entire record and the evidence presented therein before applying the harmless error standard. *Neder*, 527 U.S. at 19; *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."); *Rose v. Clark*, 478 U.S. 570, 576 (1986) (citing *Van Arsdall*, 475 U.S. at 681); *United States v. Hasting*, 461 U.S. 499, 509 (1983) ("Since *Chapman*, the Court has consistently made clear that it is the duty of a reviewing court to

consider the trial record as a whole and to ignore errors that are harmless[.]"). If, after conducting such an examination, "the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless." *Neder*, 527 U.S. at 19.

The Appellate Court in Mack's case was confronted with a constitutional error that occurred not during the course of a jury trial, but in the trial court's imposition of an extended term natural life sentence. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 8-9.) The Appellate Court acknowledged that "the trial court violated *Apprendi* when it sentenced [Mack] to an enhanced term of natural life imprisonment based on [its] factual finding that the crime was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (*Id.*) Nonetheless, the Appellate Court found that the *Apprendi* violation was harmless because "a jury would undoubtedly find [Mack]'s behavior to be exceptionally brutal and heinous, indicative of wanton cruelty." (*Id.* at 9.) The court cited the following evidence in support of its finding:

> [Mack] entered the bank, approached Kolar, and without speaking, he put a gun to Kolar's neck. A startled Kolar reacted to move the gun away and [Mack] shot Kolar in the arm. [Mack] pushed Kolar over to an area of the bank near [the] windows with a gun pressed into Kolar's back. [Mack] then forced Kolar to lay on his back before [Mack] stood, straddling Kolar between his legs, and fatally shot him in the chest.

(*Id.*) Although the court did not give a citation for this evidence, it is apparent that it relied on the evidence presented to the trial court at the guilt phase of the state court proceedings. (*See id.* at 2-3, 9.) In relying on this evidence to the exclusion of the evidence Mack presented at the second sentencing hearing, the Appellate Court ignored the Supreme Court's requirement that a reviewing court conducting harmless error analysis must scrutinize the actual basis on which the

23

finder of fact rested its decision and consider the entire record. *Sullivan*, 508 U.S. at 279; *Neder*, 527 U.S. at 19.

In reviewing the trial court's decision under the doctrine of harmless error, the Appellate Court should have scrutinized the evidence that was presented at the proceeding that made the extended term sentence possible, which was the second sentencing hearing. *Sullivan*, 508 U.S. at 279. Here, the Appellate Court was not reviewing Mack's conviction; it was reviewing the sentencing decision the trial court made at the conclusion of the second sentencing hearing.[9] Instead of focusing on all of the evidence submitted at that proceeding, it unreasonably applied the federal harmless error standard by only considering the evidence that the trial court had found at the guilt phase. The proceeding in which the jury found that Mack was not eligible for the death penalty, however, was the second sentencing proceeding. The problem with the Appellate Court's application of the harmless error doctrine is that it assumed that any jury would find that Mack acted with wanton cruelty simply because the trial court found at the guilt phase that Mack intentionally shot Mr. Kolar. This finding required the Appellate Court to ignore the entirely different version of events Mack presented at the sentencing hearing—as well as the resulting jury verdict—which, of course, was the proceeding the Appellate Court was charged with reviewing.

---

[9]That proceeding took place because no jury previously had found that Mack acted with intent or knowledge or was otherwise eligible for a death sentence. (R. 11, Answer, Ex. H, *People v. Mack*, 658 N.E.2d at 440, 444.)

24

Even if the Appellate Court's decision was based on its review of the State's evidence at the second sentencing hearing rather than the evidence from the guilt phase,[10] its finding unreasonably applied the Supreme Court's rule that a reviewing court should review the *whole record* of a case before deciding whether a constitutional error was harmless. *See, e.g. Neder*, 527 U.S. at 19. Mack presented evidence during the second sentencing hearing that was contrary to the evidence submitted at the guilt phase. The Appellate Court did not acknowledge that evidence when it concluded that "a jury would undoubtedly find [Mack]'s behavior to be exceptionally brutal and heinous, indicative of wanton cruelty." (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 9.) As discussed above, the jury that reviewed the evidence presented at the second sentencing did not find that Mack acted with the requisite intent or knowledge to justify imposition of the death penalty. The Appellate Court ignored Mack's evidence and the jury's actual finding in conducting its harmless error analysis. Because it did not review the entire record in Mack's case, its decision involved an unreasonable application of the federal harmless error doctrine. *Neder*, 527 U.S. at 19; *Van Arsdall*, 475 U.S. at 681; *Rose*, 478 U.S. at 576; *Hasting*, 461 U.S. at 509. For these reasons, we find that Mack has met the requirement for relief pursuant to 28 U.S.C. § 2254(d)(1).

**III.    Application of the *Brecht v. Abrahamson* Standard**

Though we have found that Mack has met the requirements for federal habeas relief under Section 2254(d), our inquiry does not end there. Mack is only entitled to habeas relief if his current custody violates the Constitution or the laws of the United States. 28 U.S.C. § 2254(a);

---

[10]It is apparent that the Appellate Court relied on the evidence at the guilt phase, but it never explicitly acknowledged this to be the case. (R. 11, Answer, Ex. L, Modified Order of Ill. App. Ct. at 2-3, 9; R. 11, Answer at 11-13.)

*see also Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003). In *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), the Supreme Court made clear that a petitioner is only entitled to habeas relief if the complained-of error caused actual prejudice. The Court held that the proper test governing harmless error review at the federal habeas stage is whether the constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict," or in this case, the sentence.[11] *Brecht*, 507 U.S. at 637; *see also Aleman*, 320 F.3d at 690; *Hinton v. Uchtman*, 395 F.3d 810, 819-820 (7th Cir. 2005), *cert. petition filed*, No. 04-10326 (May 20, 2005). In other words, Mack is only entitled to relief if there is a causal connection between the Appellate Court's misapplication of the harmless error standard and Mack's continued custody. *Id.* at 690-91. The Supreme Court has refined the *Brecht* standard by holding that a habeas petitioner should prevail where a federal habeas judge finds that "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432 (1995); *see also Cowen*, 227 F.3d at 898 n.3.

We easily find that Mack's claim meets the *Brecht* standard. Mack is currently serving a natural life sentence supported solely by the Appellate Court's finding that the trial court's *Apprendi* violation was harmless. But-for its unreasonable determination of facts and application of the harmless error standard, Mack would not be serving that sentence. Though Mack may still

---

[11]Mack argues that the *Brecht* standard is inapplicable here because his claim is that the state court unreasonably applied the harmless error doctrine in the state proceeding and not that the error should be deemed harmless in this proceeding. (R. 13-2, Pet.'s Reply at 6 n.2.) In *Aleman*, however, the state appellate court concluded that a harmless trial error occurred. 320 F.3d at 689. At the federal habeas stage, the defendant argued that the court unreasonably applied the federal harmful error standard. *Id.* The Seventh Circuit held that the federal court reviewing the defendant's claim should apply both the AEDPA and the *Brecht* standards. *Id.* at 690-91. As a result, we review Mack's claims under both standards.

be eligible for incarceration under the 1979 statute governing non-extended terms for murder, his current incarceration is the direct result of the Appellate Court's error. Thus, Mack has met the *Brecht* standard and is entitled to habeas relief pursuant to 28 U.S.C. § 2254(a).

## CONCLUSION

This delayed criminal case is tragic on many different levels. Yet, a sentencing jury's verdict must be given full force under *Apprendi* and its progeny case law. The jury's verdict in this case strongly acknowledged that Mr. Kolar's death may not have been intentionally caused by Larry Mack. Therefore, for the reasons set forth above, we find that the modified order on rehearing of the Illinois Appellate Court is based on an unreasonable determination of the facts presented at the state court proceeding and rests on an unreasonable application of the harmless error standard. As a result, we grant Mack's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). (R. 1-1.) The Circuit Court of Illinois shall have 60 days to hold a new sentencing hearing to determine Mack's eligibility for an extended term natural life sentence or to re-sentence Mack to a non-extended term of imprisonment of no more than forty years.

ENTERED: _____

**Judge Ruben Castillo**
**United States District Court**

**Dated: August 25, 2005**